IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:09-HC-2121-D

| | |
|---|---|
| J'BARRE JeQUIZ HOPE, )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>GEORGE KENWORTHY, )<br>)<br>Respondent. ) | **ORDER** |

J'Barre JeQuiz Hope, a state inmate, petitions the court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 [D.E. 1]. On May 6, 2011, Tabor Correctional Institution Administrator George Kenworthy ("respondent") answered the petition [D.E. 8] and filed a motion for summary judgment [D.E. 9]. Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified Hope about the motion for summary judgment, the consequences of failing to respond, and the response deadline [D.E. 12]. On May 25, 2011, Hope responded in opposition to the motion [D.E. 13, 14]. As explained below, respondent's motion for summary judgment [D.E. 9] is granted.

I.

The North Carolina Court of Appeals summarized the facts of this case as follows:

> Kyle James Parrish was shot and killed at his home on 12 December 2004. Parrish shared the home with his girlfriend and a roommate, Chris Pennick. At the time of his murder, Parrish was selling drugs and addicted to heroin.
>
> Pennick testified that Parrish left the house to buy cigarettes on 12 December 2004. Shortly thereafter, Pennick heard a knock at the door. The man at the door, later identified as defendant, asked to use Pennick's phone, explaining that his car had broken down. As Pennick turned around to retrieve his cell phone, defendant struck him with a pistol and he fell to the ground. Pennick was then restrained with a vacuum cleaner cord and defendant threatened to kill him if he moved. Defendant asked Pennick where Parrish and the money were located. Pennick testified that another man wearing an orange mask and carrying a gun entered the house.

When Parrish returned two men pulled him into the house and asked him for his money. Pennick heard the two men hitting Parrish and demanding money. Eventually, Pennick heard screaming, gunshots, and the sound of a window breaking. Pennick heard the two men leave, and then broke free from the vacuum cleaner cord to search for Parrish. Pennick found Parrish in the middle of the road where he cradled him in his arms until he was pronounced dead by the paramedics. Expert testimony established that Parrish suffered fatal gunshot wounds to the chest and lower back, together with multiple blunt force injuries and various sharp force injuries.

Pursuant to a plea agreement, Chad Aikens testified that he and Parrish used to buy heroin from Jamal Stokes. Aikens indicated that Stokes had seen Parrish with a bag of money at Aikens' house one night. Stokes later indicated his intent to break in Parrish's home and take the money. Aikens did not participate in the actual commission of the robbery, but he expected to get some money from the robbery proceeds for his assistance.

Chevella McNeil testified that she purchased a cell phone for defendant. Cell phone records and expert testimony indicated numerous calls on the day of the shooting between Stokes' phone and Aikens' phone and between Stokes' phone and defendant's phone. Records placed Stokes' phone at the scene of the crime and then at a Raleigh hotel. Eyewitness testimony established that a taxi driver [Mansour] picked up Stokes and defendant from a Raleigh hotel shortly after the time of the shooting and drove them to Durham. Records showed calls from Aikens' phone to the taxi company that picked up Stokes and defendant. Records also placed defendant's phone at the Raleigh hotel shortly after the shooting, in Durham that afternoon, and in the Greenville area shortly after midnight the next day. Authorities located defendant about a month later in a residential trailer in Grifton, near Greenville. Defendant was in the bedroom and his cell phone was within reach when he was arrested. Police obtained photographs from the cell phone . . . .

State v. Hope, 189 N.C. App. 309, 312–13, 657 S.E.2d 909, 910–11 (2008).

On May 18, 2006, a jury convicted Hope of first-degree murder, and the court sentenced Hope to life imprisonment without parole. Id. at 312, 657 S.E.2d at 910. Hope appealed. On March 18, 2008, the North Carolina Court of Appeals found no prejudicial error. Id. at 320, 657 S.E.2d at 915. On June 11, 2008, the Supreme Court of North Carolina denied review. State v. Hope, 362 N.C. 367, 664 S.E.2d 315 (2008). On January 26, 2009, Hope filed a pro se motion for appropriate

relief ("MAR") in the Superior Court of North Carolina, Wake County, which that court denied on April 17, 2009. Pet. 5–6. On June 10, 2009, Hope filed a pro se certiorari petition in the North Carolina Court of Appeals, which that court denied on June 29, 2009. Id. 6.

II.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis removed) (quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

A federal court cannot grant habeas relief in cases where a state court considered a claim on its merits unless (1) the state-court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or (2) the state-court decision was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d). A state-court decision is "contrary to" Supreme Court precedent if it either "arrives at a conclusion opposite to that reached by [the

3

Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to the Supreme Court's result. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state-court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407; see Bobby v. Dixon, No. 10-1540, 2011 WL 5299458, at *4–5 (U.S. Nov. 7, 2011) (per curiam); Cavazos v. Smith, No. 10-1115, 2011 WL 5118826, at *3–5 (U.S. Oct. 31, 2011) (per curiam); Renico v. Lett, 130 S. Ct. 1855, 1862 (2010).

> [Section 2254(d)] does not require that a state court cite to federal law in order for a federal court to determine whether the state court decision is an objectively reasonable one, nor does it require a federal habeas court to offer an independent opinion as to whether it believes, based upon its own reading of the controlling Supreme Court precedents, that the [petitioner's] constitutional rights were violated during the state court proceedings.

Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000) (en banc). Moreover, a state court's factual determination is presumed correct, unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Sharpe v. Bell, 593 F.3d 372, 378 (4th Cir. 2010).

Congress intended the AEDPA standard to be difficult to meet. Harrington v. Richter, 131 S. Ct. 770, 786 (2011). "Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." Id. at 787. Stated succinctly, in order to prevail, a petitioner must show "there was no reasonable basis . . . to deny relief." Id. at 784; see DeCastro v. Branker, 642 F.3d 442, 449–50 (4th Cir. 2011), petition of cert. filed, (U.S. Sept. 26, 2011) (No. 11-6640).

Under the doctrine of procedural default, a federal court generally is precluded from

4

reviewing the merits of any claim that the state court found to be procedurally barred based on independent and adequate state grounds. See, e.g., Dretke v. Haley, 541 U.S. 386, 392 (2004); Daniels v. Lee, 316 F.3d 477, 487 (4th Cir. 2003). The doctrine also applies "when a state court . . . discusses the claim on its merits, e.g., in conducting a plain error review having found a procedural default." Daniels, 316 F.3d at 487. A state rule is "adequate" if it is firmly established and consistently applied by the state court. See Johnson v. Mississippi, 486 U.S. 578, 587 (1988); McCarver v. Lee, 221 F.3d 583, 588 (4th Cir. 2000). A state rule is "independent" if it does not depend upon a federal constitutional ruling. See, e.g., Ake v. Oklahoma, 470 U.S. 68, 75 (1985).

However, a federal habeas court may review a procedurally defaulted claim if the petitioner demonstrates cause and prejudice as a result of the alleged violation of federal law, or that the failure to consider the federal claim will result in a fundamental miscarriage of justice. See, e.g., Coleman v. Thompson, 501 U.S. 722, 750 (1991). To show cause, a petitioner must show that something external to him prevented him from complying with the state procedural rule. Id. at 753. To show prejudice, a petitioner must show he was actually prejudiced as a result of the alleged violation of federal law. See, e.g., United States v. Frady, 456 U.S. 152, 167–68 (1982).

A.

Hope first asserts a "constructive amendment of the indictment through instructions to the jury" in violation of the Fourteenth Amendment to the United States Constitution because the trial court "instructed the jury that it could convict defendant if [the jury] found that [he] had comitted [sic] robbery with a firearm or attempted robbery with a firearm, although the indictment returned by the grand jury did not allege robbery with a firearm or attempted robbery with a firearm." See Pet. 5 (ground one). Hope did not raise this argument on direct appeal (he states his appellate

5

Case 5:09-hc-02121-D   Document 15   Filed 11/17/11   Page 5 of 15

attorney "refused" to raise it), but he did raise it in his MAR. The MAR court summarily denied this claim as procedurally barred and meritless. Mot. Summ. J. Ex. 9 (April 17, 2009 order denying MAR).

A "constructive amendment" of an indictment occurs "'[w]hen the government, through its presentation of evidence or its argument, or the district court, through its instructions to the jury, or both, broadens the bases for conviction beyond those charged in the indictment[.]'" United States v. Ashley, 606 F.3d 135, 141 (4th Cir. 2010) (quoting United States v. Malloy, 568 F.3d 166, 178 (4th Cir. 2009), cert. denied 131 S. Ct. 428 (2010). "A constructive amendment is a fatal variance because the indictment is altered 'to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment.'" United States v. Randall, 171 F.3d 195, 203 (4th Cir. 1999) (quoting United States v. Schnabel, 939 F.2d 197, 203 (4th Cir. 1991)). Any other variance "does not violate a defendant's constitutional rights unless it prejudices the defendant either by surprising him at trial and hindering the preparation of his defense, or by exposing him to the danger of a second prosecution for the same offense." Ashley, 606 F.3d at 141 (internal quotation marks and citation omitted). Moreover, a claim alleging defects in a state court indictment is "not ordinarily a basis of federal habeas corpus relief unless the deficiency makes the trial so egregiously unfair as to amount to a deprivation of the defendant's right to due process." See, e.g., Ashford v. Edwards, 780 F.2d 405, 407 (4th Cir. 1985).

Here, Hope has not shown that the trial court's jury instructions impermissibly broadened the basis for his conviction for first-degree murder. Hope has not shown that the alleged variance surprised him or hindered his defense in any way, or that he now faces a risk of being convicted for robbing Parrish or Pennick in addition to murdering Pennick. Likewise, Hope has not shown a

6

deprivation of due process. Accordingly, Hope has failed to show that the MAR court's rejection of this claim was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court, and this claim fails. See 28 U.S.C. § 2254(d)–(e).

B.

Next, Hope asserts a "constitutionally defective indictment" because the indictment "did not allege all the elements of first-degree murder" and "did not allege the provision of the statute petitioner was charged with violating." Pet. 6 (ground two). Hope did not raise this argument on direct appeal (he states his appellate attorney "refused" to raise it), but he did raise it in his MAR. The MAR court summarily denied this claim as procedurally barred and meritless. Mot. Summ. J. Ex. 9 (April 17, 2009 order denying MAR). Respondent acknowledges that Hope "was indicted for first-degree murder with the standard 'short-form' murder indictment." Mem. Supp. Mot. Summ. J. 14.

The Supreme Court of North Carolina "has consistently held that indictments for murder based on the short-form indictment statute are in compliance with both the North Carolina and United States Constitutions . . . . [, and] that the short-form indictment is sufficient to charge first-degree murder on the basis of any of the theories, including premeditation and deliberation, set forth in N.C.G.S. § 14-17, which is referenced on the short-form indictment." State v. Braxton, 352 N.C. 158, 174, 531 S.E.2d 428, 437 (2000) (citations omitted); see State v. Squires, 357 N.C. 529, 537, 591 S.E.2d 837, 842 (2003). Hope has not shown that the MAR court's ruling on this issue reached a result contrary to, or involved an unreasonable application of, clearly established federal law. See Stroud v. Polk, 466 F.3d 291, 295 (4th Cir. 2006); Allen v. Lee, 366 F.3d 319, 323–24 (4th Cir. 2004) (en banc) (per curiam); Hartman v. Lee, 283 F.3d 190, 198–99 (4th Cir. 2002). Likewise,

7

the state court's ruling was not based on an unreasonable determination of facts, in light of the evidence presented in the state-court proceeding. See 28 U.S.C. § 2254(d)–(e). Thus, this claim fails.

C.

Next, Hope asserts ineffective assistance of counsel for counsel's failure to: (1) "have [the] trial court inquire into [jurors'] potential racial bias in an interracial violent crime" and (2) "file [a] motion to exclude testimony derived from impermissibly suggestive identification procedure." Pet. 8 (ground three). Hope did not raise these arguments on direct appeal (he states his appellate attorney "refused" to raise them), but he did raise them in his MAR. The MAR court denied this claim as procedurally barred and meritless. Mot. Summ. J. Ex. 9 (April 17 2009 order denying MAR).

The Sixth Amendment right to counsel includes the right to the effective assistance of counsel. See Bobby v. Van Hook, 130 S. Ct. 13, 16 (2009) (per curiam); Strickland v. Washington, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of trial counsel, a habeas petitioner must establish two things. First, a petitioner must show that the counsel's performance was deficient in that it was objectively unreasonable under prevailing professional norms. See Van Hook, 130 S. Ct. at 16; Strickland, 466 U.S. at 687–91. In reviewing this element, a court must be "highly deferential" of counsel's performance and must make every effort to "eliminate the distorting effects of hindsight." Strickland, 466 U.S. at 689. Therefore, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.; Gray v. Branker, 529 F.3d 220, 228–29 (4th Cir. 2008). Second, a petitioner must show there is a "reasonable probability" that, but for the deficiency, the outcome of the proceeding

8

would have been different. Strickland, 466 U.S. at 694.

As for Hope's contention concerning his attorney's failure to inquire into each jury venire member's potential racial bias during voir dire, Hope notes that he "is an African American male who was charged with first-degree murder of a white male" and cites Turner v. Murray, 476 U.S. 28, 35–37 (1986), in support of his claim. Mem. Supp. Pet. 3. In Turner, the United States Supreme Court held that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." 476 U.S. at 36–37. However, "a defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry." Id.

The Supreme Court expressly limited its holding to capital offenses, and noted that "the mere fact that petitioner is black and his victim white does not constitute a special circumstance of constitutional proportions." Id. at 33 (quotation marks omitted). Thus, in non-capital offenses, "[t]he broad inquiry in each case must be whether under all of the circumstances presented there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be indifferent as they stand unsworn." Id. (internal alterations, quotations, and citation omitted).

Here, Hope was not tried capitally. Thus, Turner does not apply to his case. Moreover, Hope does not contend that he sought and was denied the opportunity to question prospective jurors about racial prejudice, nor does he contend that issues of race were "inextricably bound up with the conduct of the trial." Ristaino v. Ross, 424 U.S. 589, 597 (1976) (distinguishing Ham v. South Carolina, 409 U.S. 524 (1973)).

There is no constitutional presumption of juror bias for or against members of any

9

particular racial or ethnic group, presumably even when a jury pool is predominantly white. Indeed, the Supreme Court has cautioned trial courts to avoid entertaining the divisive assumption—as a per se rule—that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion.

Goins v. Angelone, 226 F.3d 312, 323 (4th Cir. 2000) (quotations and citations omitted), abrogated on other grounds by Bell v. Jarvis, 236 F.3d 149 (4th Cir. 2000). Accordingly, Hope has not shown that the MAR court's ruling on this issue reached a result contrary to, or involved an unreasonable application of, clearly established federal law. See, e.g., United States v. Jeffery, 631 F.3d 669, 673–74 (4th Cir. 2011); Jacobs v. Horn, 395 F.3d 92, 118 (3d Cir. 2005); Daniels v. Burke, 83 F.3d 760, 766 (6th Cir. 1996). Likewise, the state court's ruling was not based on an unreasonable determination of facts, in light of the evidence presented in the state-court proceeding. See 28 U.S.C. § 2254(d)–(e). Thus, this claim fails.

As for Hope's challenge to the identification procedure, Hope contends that the failure of law enforcement to use the "'double blind lineup' procedure"[1] in showing a photograph of Hope to two witnesses, Pennick and Mansour, was improper, and his counsel was ineffective for failing to challenge the "impermissibly suggestive" photo identification. Mem. Supp. Pet. 6–7.

At trial, Raleigh Police Detective Copeland testified about the photographic identification procedure used with Mansour and Pennick as follows:

> THE COURT: Okay. Bring the jury back.
> (Jury enters the courtroom.)
> BY MR. MANGUM:
> Q. Detective Copeland, you had—you met with Mr. Mansour on the 16th, is that right?

---

[1] A double-blind identification procedure "means that someone that is completely unfamiliar with the case, that knows absolutely nothing, no names, no faces or nothing, comes in and shows your lineup." Mot. Summ. J. Ex. 13, at 482 (trial transcript).

10

A. Yes, sir, around that date.
Q. Okay. Then had him back down to the police station for the purposes of showing him a photo lineup that he described yesterday?
A. Yes, sir, that is correct.
Q. Tell the jury how that process went.
A. We contacted him on Tuesday the 21st of December of 2004. I asked him if he could come back to the police station and view some photographs.

. . .

Q. Tell the process that you used in showing that photo lineup to him?
A. Well, we had—we had obtained information and obtained Jbarre Hope's name and information. We obtained a color photograph from the Department of Motor Vehicles, along with five other similar pictures, color from the Department of Motor Vehicles, and had six separate photographs of six separate individuals, with similar features to show Mr. Mansour a photographic lineup.
Q. Did you follow the process that you always follow in showing a person a photo lineup?
A. Yes, sir, I do.
Q. Do you do anything to suggest to the person which person that they should pick out?
A. No, sir. It's—it's the same procedure every time. And being a detective for seven years, you use the same procedure every time, and you say the same thing. You don't say anything suggestive. My—when I have a conversation with somebody I'm about to show photographs to, I tell them I would like them to look at the photographs, and I would like for them to see if there's anybody that they are familiar with.
Q. Okay. And is that the words that you went through with Mr. Mansour when you showed him the pictures?
A. Yes, sir, that's correct.

. . .

We get to photograph number 4, and Mr. Mansour immediately stopped and says that's the man that got in my taxicab. That is one of the men that got in my taxicab.
Q. Okay. What, if any, markings did you have Mr. Mansour make on that picture, after he made that identification? And let me finish, did you show him 5 and 6 as well?
A. Yes, sir, I did. I slid that photograph to the side, just like I did the other photographs and showed him photograph 6 and 7 also. And the only photograph he identified was photograph number 4.
Q. Okay. And what markings did he and you make on that?
A. Mr. Mansour, on the side over here, put the date, the time, his signature, which was somewhat not that identifiable, so I made him put his initials there.

11

...

> Q. Okay. After that process is over with, what's your next responsibility in this case?
> A. We contacted Chris Pennick, which is other witness or victim, and asked him if he had a few minutes to come to the police department, and he said he would.
> Q. And what happened when you had that contact with Mr. Pennick?
> A. Mr. Pennick came to the police station. I went through the very same procedure with him. We sat down. I believe that day we actually went back through his account of things very quick. Asked him if he could recall the subjects best as he could that was inside of his house. He stated that he would.
>     I think he only sat there for a few minutes while not saying anything to him. I said I want to show you some photographs, and you let me know if there is anybody you are familiar with. And he did the same exact procedure as I—they're actually out of order this time, but I showed him the photographs one at the time so he could look at the facial features. Slid them out of the way, just like I did before. And when he got to number 4, he immediately stopped and says that's the man that came to my door. That is him.
> Q. Okay. Did you have him make a marking on that?
> A. No, sir, I did not.
> Q. Why not?
> A. Because Mr. Mansour, obviously, be perfectly honest with you, we had only gotten one color photograph at the time from Department of Motor Vehicles and Mr. Mansour had made a mark on that. **And from this picture you can obviously see that it cannot be seen and we did not want to identify that Mr. Mansour had made a mark on there. So it was not no more than his face was showing.**

Mot. Summ. J. Ex. 13, at 465–72 (emphasis added).

On cross-examination, Hope's lawyer cross-examined Detective Copeland about the Actual Innocence Commission's recommendation for using a double-blind identification procedure, but did not object to the admission of the evidence at trial. Mot. Summ. J. Ex. 13, at 479–80. Moreover, Hope's lawyer attacked the accuracy of Pennick and Mansour's identifications throughout the trial, apparently hoping to show that Hope's brother may have been the perpetrator rather than Hope, based on their similarities in appearance. See id. at 263–69 (cross-examination of Pennick), 296–99 (cross-examination of Mansour), 625–33 (closing argument by Hope's lawyer).

The Due Process Clause prohibits the admission into evidence at trial identification testimony

which results from unnecessarily suggestive procedures that may lead to an irreparably mistaken identification. See Neil v. Biggers, 409 U.S. 188, 198 (1972); United States v. Saunders, 501 F.3d 384, 389 (4th Cir. 2007) ("Due process principles prohibit the admission at trial of an out-of-court identification obtained through procedures 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" (quoting Simmons v. United States, 390 U.S. 377, 384 (1968))). The court evaluates the identification procedure using a two-step process. "First, the defendant must show that the photo identification procedure was impermissibly suggestive." Saunders, 501 F.3d at 389. "Second, if the defendant meets this burden, a court considers whether the identification was nevertheless reliable in the context of all of the circumstances." Id. at 389–90.

Hope cannot meet either prong of this analysis. Although Hope would have preferred that the investigators use a different photographic identification procedure, he has not shown that the identification procedure used in his case gave rise to an identification which was so impermissibly suggestive as to taint any witness's subsequent in-court identification of Hope. Detective Copeland showed the photographic lineup to Mansour and Pennick completely separately from one another, and took steps to ensure that Pennick did not know Hope had been identified by another witness. Hope's attorney was allowed to cross-examine Detective Copeland concerning the procedure he used for obtaining Pennick and Mansour's identifications, and to present evidence throughout the trial concerning the accuracy of Pennick and Mansour's identifications of Hope. Moreover, Hope does not show how non-compliance with recommendations by a state commission[2] (or with the North

---

[2] Although Hope cites to an "Actual Innocence Act of 2003," Mem. Opp'n Mot. Summ. J. 5, there is no such legislative act. On October 9, 2003, the North Carolina Actual Innocence Commission "issued recommended procedures for law enforcement officials conducting eyewitness

13

Case 5:09-hc-02121-D Document 15 Filed 11/17/11 Page 13 of 15

Carolina Eyewitness Identification Reform Act ("EIRA"), N.C. Gen. Stat. §§ 15A-284.50 to -284.53, which was enacted after Hope's prosecution and conviction) violates clearly established federal law as determined by the Supreme Court of the United States for purposes of 28 U.S.C. § 2254(d)(1). Additionally, the remedies for any violation of the EIRA include admissibility of non-compliance into evidence at trial "in support of claims of eyewitness misidentification," N.C. Gen. Stat. § 15A-284.52(d)(2), which Hope's attorney was allowed to do. Accordingly, Hope has not shown that the MAR court's ruling on this issue reached a result contrary to, or involved an unreasonable application of, clearly established federal law. See, e.g., Biggers, 409 U.S. at 198; Saunders, 501 F.3d at 389. Likewise, the state court's ruling was not based on an unreasonable determination of facts, in light of the evidence presented in the state-court proceeding. See 28 U.S.C. § 2254(d)–(e). Thus, this claim fails.

Alternatively, Hope's claim is procedurally defaulted for his counsel's failure to contemporaneously object to the admission of the evidence in question at trial. See Wainwright v. Sykes, 433 U.S. 72, 86–87 (1977) (providing that contemporaneous objection rule barred federal habeas review); see also N.C. R. App. P. 10(b)(1) (stating that to preserve error for appellate review, error must be challenged at trial). Moreover, as stated, trial counsel was not deficient in failing to object to the identification evidence.

III.

In sum, the court GRANTS respondent's motion for summary judgment [D.E. 9] and DISMISSES Hope's application for a writ of habeas corpus [D.E. 1]. The court also DENIES a

---

identification in North Carolina." Jerome M. Maiatico, All Eyes On Us: A Comparative Critique of the North Carolina Innocence Inquiry Commission, 56 Duke L.J. 1345, 1357 (2007).

certificate of appealability. See 28 U.S.C. § 2253(c); Miller-El v. Cockrell, 537 U.S. 322, 336–38 (2003); Rose v. Lee, 252 F.3d 676, 684 (4th Cir. 2001). The Clerk of Court shall close this case.

SO ORDERED. This 17 day of November 2011.

JAMES C. DEVER III
Chief United States District Judge